Basically what they told me was that that type of agreement was not the company's normal procedure and that Mr. Shannon should not have made the agreement.

*It was a no win situation for me and again in good faith I had no choice but to end this controversy, especially with my immediate manager, although I could have chosen to take a discriminatory action.*

**Element # 3, and evidence supporting the element:**

**(Disparate Racial Treatment in Elimination of the Sources of My Work Related/ Occupational Illness)**

On the first day of my employment, upon my arrival at work, it was brought to my attention first by Mr. Shannon and then by many others that a memo about me joining the company had been sent to all employees throughout the company using the e-mailing system, as well as postings on bulletin boards. This memo announced and listed all my occupational health and safety-related certifications and licenses. Also, the memo listed all my advanced academic backgrounds in manufacturing specialization (AS, BS, and MS). What I noticed was that the memo specifically emphasized my 12- years of safety work-related experiences. However, I was not hired as a safety specialist but as the "Production Supervisor", which only requires a high school diploma, but preferably someone with a degree, and only requires 3-5 years of any related experience. The memo, however, seemed to portray me to others as a safety specialist. Mr. Shannon, without going through the itemized safety issues, hinted at me that that was why they've decided to choose me among all the applicants, and briefly mentioned that the company appeared to possibly have some safety emissions, especially at the department that I have been hired for.

Surprisingly moments after, upon beginning my employment on the first day of work at 'Tyco", the first thing I noticed was that I was experiencing eye irritation, redness and respiratory problems. At first I presumed that it must be some kind of a flu-like illness. However, as the days went by the symptoms each day had become more severe. I also noticed that the symptoms are clearly very noticeable and it only occurred at work, shortly after walking into the work site, and anytime after 10–45 minutes, and that many other manufacturing operators also experienced similar symptoms. At the end of the work day, many of my colleagues, including other supervisors, would joke around saying to me, "You must be either very high on drugs or completely drunk". Or, "Wow !! Your eyes are extremely bloodshot, are you feeling all right?" I suspected that my symptoms were due to some exposure at work, but wanting to respond very diplomatically and not wanting to create a panic among the workers, I would respond something like, "No, I am all right, it is just an allergy."

On the first month of my employment, I began to spend time, in addition to working as supervisor, to begin doing my own research to detect the source of my and other workers' ill health at work. The first thing that I clearly noticed was that the facilities, especially in the department that I had been assigned as worker supervisor (Gel-Mix dept., 60's & 80's areas), had a very bad chemical dust condition (visible dry chemical powders), especially in the area around the "Chemical Auto-Mix Processing". The facility throughout the company *looked* very modern and superficially clean, with bright new paint and stainless steel machinery throughout the entire plant, but it wasn't. Workers (primarily temporarily employed workers) were routinely assigned to do the housekeeping every day throughout the day in visible and employee traffic areas. I also noticed that the majority of these temporary workers (90%) were individuals of minority racial category, consisting of African-Americans, Hispanics, and Polish people.  Many were non-fluent in the English

language and minimum wage employees. What was amazing to me was that many of these temporarily employees were showing similar symptoms, but much more severe than other permanent employees whose jobs were not related to cleaning the dust. Excessive air-born chemical dust generation in the air, floor and machinery could easily be seen on practically most surfaces in the entire department by the end of the each work shift, especially in the areas that I was mainly assigned for supervision (Hydro-gel Department). The areas not readily visible contained up to 1-inch of chemical dust on surfaces. But, again all the visible and accessible areas appeared seemingly clean, since it had been wiped and swept regularly throughout the entire working hours.

Doing my investigation of sources of my ill health, I noticed that the Chemical Auto-Mix, which was one of the generators of the dust, had not been designed air-close fitting and therefore had been highly subjected to producing air-borne dry chemical powder. This machine had been designed and was built in-house approximately 15-years ago. The only feasible corrective action and best alternative after giving the situation serious thought, in my opinion and after discussing other available options with the management, would have been the complete redesigning of the entire manual chemical mixing process as well as automatic chemical feeding of the process. In spite of that fact, there was a proposal rejection for the redesigning since it would have been considered a major project, very costly and unquestionably required extensive machine downtime, affecting the entire manufacturing production. This department was considered to be the so-called "heart of the company" and was providing the elementary substance to furnish the initial component that is essential throughout the company's different production processes.

At several times during the day, when Auto-Mix was fully functional for a good period of time, you could easily see clouds of many mixed chemical powders floating in the air. Later on near the end of the year 2001, a few months before the unexpected notification of my job termination, I had found out that the roof ventilation systems had not been functional at all for many years. This roof ventilation system had been located on the ceiling approximately 30-feet high. All along I was under the assumption that it had been functional but not very effective. But, to my very surprise, I was told by one of the maintenance personnel that years back they were instructed by the management to asphalt over the roofing exhaust system and to disconnect the roof ventilation electrical panel system. However, they left the production area ceiling ventilation in place as if to make believe that it is operating. So, anyone looking from the ground would assume that this exhaust ventilation must have been functional. I had no idea that it had not been functional at all, and the management never brought it to my attention, and never took corrective actions even though they knew I and many others had been suffering as the result excessive exposure to chemical dust. To my surprise, one of the longtime maintenance personnel told me that this was done as a result of the management's request, primarily in order to save in the loss of heating and air-conditioning.

Continuing my investigation of sources of my ill health, I noticed excessive existent of molds and mildews on mezzanine beneath the sodium-amps tanks,  around the underside of the 60's-Line machines, inside the pit-grading trench (for over spill collection of gel/chemicals liquid), laboratory hoods around the sink and walls near the calibration testing equipment, floors, and all associated wood cabinets. This especially is not acceptable when the employer is manufacturing and marketing a wide range of very high sensitive medical and healthcare products. Upon my findings I immediately notified my immediate managers, but since no action was taken, I contacted Patrick Malia (Manager of Quality Control & Internal Inspection & Audits). He told me he will look into this safety issue. Months passed by and no action was taken. I then contacted Tony Wozniak (Director of Facility Dept.) by going for a walkthrough inspection, and showed him the locations of mold and mildews. Again months passed by and no action was taken. I then contacted Gerry Gagne (Director of Maintenance Department). Same thing once more, months passed by and no action was taken.

Finally, after 1-full year that had passed from my repeated requests of corrective actions, management decided to replace all the rotten wood cabinets with stainless steel cabinets and counters. Additionally, many of the laboratory hoods chemical mix ventilation in that department had not been fully functional for years. Again, after going through the same chain of commands and repeated requests by me, the laboratory hoods ventilation systems were inspected and corrected.

Moreover, another area in that department (the chemical room storage and manual chemical mixing room) has no means of ventilation system at all. Also, this manual chemical mixing room had two ways of entry/exit with no doors, accessible to any one at any time. On many different occasions in this chemical storage and mix room we had experienced toxic chemical spills. In addition, this chemical storage and mix-room many times had been flooded with up to 6-inches of water. This flooding occurred as the result of occasional over-floats of the adjacent gel-pit. The gel-pit chemical waste material which had to be pumped out would malfunction regularly and would be leading into the city sewage discharge system. I brought up this hazardous operation practice many times to the management's attention and recommended corrective actions. But, they would either ignore my comments entirely, or choose a temporarily solution. They would much rather concentrating on projects that would be assisting them to speed up the production, and would intentionally overlook many unsafe practices. Essentially, they did not want to get involved with corrective actions of any safety issue projects that would take away from the company's profits. This repeated over-floating from the gel-pit was also caused mostly from a combination of the deficiency in the original pit design not being able to handle heavy density chemical gel-ingredients and improper waste disposal practices.

Although I personally and periodically at the beginning and at the end of my shift would check for the solidified build-up of chemicals, but still we would encounter this problem regularly. The entire disposal and mixing processes had been given a serious redesigning consideration. Other contributing factors to the safety problems were that there were insufficient wall paneling for the electricity and improper amp capabilities, as well as constant loss of the trip valve, causing a routine power lost and/or tripping in check valves capability. Additionally, other departments (especially Charts Dept.) would dump their chemical waste disposal right into their sinks and then it would lead right into this pit that is located at 60's Areas. Therefore, obviously with all these chemical waste dumping the safety check valve would fail pumping the gel-pit properly. Besides, the chemical gel-mix holding tanks from the very first day of operation had not been designed appropriately because they did not have a shut off electronic sensor device. This at least would prevent the continuous accidental gel tanks overflowing directly into floor drains beneath the 60's-Line machine and ultimately leading straight into the pit.

The gel-mix tanks overflowing and bad design and other chemical disposal and mixing operation would leak into the adjacent chemical room storage, causing potential imminent reactivity, toxicity, and possible explosivity reactions. Additionally, this room had no fiber drum protection safeguard stands to raise the drums up above the floor, in order to minimize, and/or contain the chemical spills and for decontamination procedures. Every time a chemical spill happened, operators were instructed by all previous management to just push the contaminated chemicals right into the adjacent room floor drain pit. Every time I attempted to change this improper practice by bringing this up to the attention of other management including the Director of the Safety Department, it seemed as if I was slowing down production. I was repeatedly ignored and told that I was making this out of proportion, and to just concentrate on production supervisory leadership.

BEHZAD A. SAMIMI

Going back to the subject of workers and my work related illnesses, it was obvious that all this unsafe work practice and many other still to be identified by a professional had been adding to the very poor indoor air quality and making the air circulation/ filtration condition considerably worse. Knowing many of these documented tragic incidents I brought the above safety issues to the attention of other supervisors and my manager (Mr. Shannon). Very defensively changing the subject, Mr. Shannon told me to just concentrate on the production and worker's supervisory responsibilities. I told him that I was concerned about the potential health and safety of my workers. I also told him about my own personal exposure, and all the symptoms that other workers and I had been experiencing. He told me he had noticed that my symptoms had greatly increased at work, and surprisingly told me, "Your eyes looks even worse as I have began talking to you". In fact, I practically stood up and showed him the lack of HVAC ventilation (as well as lack of supply and return system) in his office and throughout many other offices. He cut me short and told me he will look into the issues. But, he then continued to say that my symptoms were probably just an over reaction caused by an allergy to some other thing.

In those same above mentioned areas, the same excessive combination of several combustible chemical powders in the department accumulated static charge, and had resulted in a massive explosion tragedy when a worker attempted to use his non explosive/ non grounded vacuum for housekeeping purposes. This caused the employee to severely burn 75% of his entire body, including greatly suffering a permanent disfiguration of his face, neck, shoulders and his entire both arms extending to his shoulders. In other instances, other department workers have had back injury. One person's entire arm went through a press machine causing permanent injury disfiguration. Almost every one of these accidental injuries was as a direct result of unsafe work environments created by the management's neglect in not identifying potential hazards. And, mostly, by management, in an attempt to speed up the production, deliberately not enforcing safety standards, and overlooking safety procedures and intentionally allowing workers to practice in unsafe work conditions and unsafely operating their machinery.

On another incident, in a different department, I personally witnessed a young worker lose three of his fingers completely right from the base of his hand in a machine which, according to OSHA standards was supposed to be protected by a machine safeguard. A few other personnel and I attempted persistently to see if we could locate the missing fingers inside the machine for possible reattachment, but after a few hours were unsuccessful since it was completely crushed to no finding at all.

A day after the above tragic incident, during a business safety transaction, I was yelled at by Mr. Scott Fearnley (a Manufacturing Supervisor from another Dept.) that why was I always try to act like a "champion" in either at this recent worker accident or other similar situations. He also told me that the worker lost his fingers because of his own stupidity and he does not even feel bad about him. I was astonished by this insensitive observation, and shook my head in disgust to his inappropriate remark and walked away. I just happened to be in the area approximately 20 feet away from this heartbreaking accident. What did he expect me to do, just to walk away, just like nothing happened? And not even try to at least assist him in finding his fingers for possible reattachment? After this particular disagreement with me, he stopped talking to me entirely. Mr. Fearnley had also talked with others about his opinion in relation to the worker's accident and repeatedly over his general feelings against me. Although somehow the entire company knew about this insensitive behavior from Mr. Fearnley, a Manufacturing Supervisor, neither the management nor Human Resources ever attempted to bring this unacceptable unsympathetic conduct to his attention. They all failed to take suitable actions even after I had gone to his immediate manager and spoken about his unacceptable behavior.

At another time, when I was trying to suggest and show step by step and functionally to Mr. Shannon how and where the Auto-Mix machine needs ergonomic redesigning, his voice all of a sudden sounded extremely rude to me and while yelling at me told me to get away from him. Then he continued to say that "when you are talking to me you come too close to me". It was loud enough that my other coworkers from a far distance noticed his rude reaction and later showed me sorrowful concern. We were at least three feet away from each other. I was talking quietly, but I was not too close to him. All I wanted to accomplish was to confidentially and discretely speak with my manger, and to prevent other workers from hearing the content of our conversation or to know the nature of our conversation.

Weeks passed by and management took no corrective measures in response to my repeated concerns. Finally, in the month of August, 2000 I decided it was necessary to bring this issue of unsafe practices to the attention of Human Resources Manager Donna Heffernan. Surprisingly supporting my findings, she told me other personnel have also been experiencing similar symptoms, and that she would look into this matter.

I believe she had contacted the Health and Safety Director Ralph Delullo, since Ralph contacted me a few days after and requested for a walkthrough of the job site with me. The first thing Ralph indicated to me, was that he was not pleased that this matter had been raised with the manager of the Human Resource Department. I told him that since weeks had gone by and all other management had taken no actions including himself from the Safety Department, I thought that I would be taking the best alternative by going to H.R. I had done so only by good faith in mind. And, then we preceded with the inspection.

During the walkthrough I practically showed him all the unsafe issues that in my opinion had potentially contributed to work related health issues and suggested possible corrective actions. However, he, the same as others, informed me that I was overreacting about the safety issues, that the company had been practicing in this manner for years and there had been no major concerns before. He saw no adverse health affects arising from the possible auto/ manual chemical mixing process dust generation, or the HVAC air circulation & filtration system. Then he jokingly told me we are not an asbestos or lead paint removal industry, and that I had been making this way out of proportion due to the nature of my past environmental safety work experience. And, again, same as all others he told me he would look into my concerns although he was quite convinced that my symptoms were probably just an overreaction caused by an allergy to some other thing at work. He then jokingly told me that maybe the redness of my eyes was telling me to look for another job.

I relied on reporting violations of general safety standards first to the management, HR, and safety departments within the company rather than going to outside authorities. I wanted to give a reasonable period of time to remedy the violation, but based on disparate racial treatment against me they completely and deliberately ignored my well justified findings, and instead either not responded or criticized me for it.

Needless to say that the only corrective action taken was just to inform operators to do a better housekeeping work, which basically meant sweeping and mopping the floors more often. As of the date of my job termination dated 2/8/02, no permanent corrective actions, prevention or elimination of the sources of safety issues had been implemented. And, I have no knowledge if any safety measurements have been implemented after my job termination.

I had suggested many times before to the safety department that we should conduct a legitimate exposure assessment industrial hygiene air quality monitoring. True and authentic factual air monitoring should be conducted in 8-hours Time Weighted Average (TWA), and when the actual chemical mixing is in full process, using a Personal Monitoring Assessment and certainly it should be conducted in the worker

"breathing zone areas". This exposure assessment monitoring also should be aimed to identify Permissible Exposure Level (PEL), and Threshold Limit Value (TLV). Also, air monitoring sampling for all average, single evaluation of "Short Term/ Long Term/ 30-Minutes Assessment", "Worse Case Scenario", "Highest/ Lowest Peak Operation", especially when the auto or manual mixing is in full function, should be taken. Additionally, for comparing to a standard, these should be taken at times when the chemical Auto-Mix is not functional, in off-shift hours, and during initial, middle, and end of the day shutdown/week-end shut down conditionings. It is very imperative that all working and non-working conditions be taken under consideration to calculate the legitimate and justifiable value of worker exposure assessments. But certainly, it is not proper to intentionally take samples at the times of no disturbance only, or at places far away from the known potential exposure locations or in pre-determined designated areas.

I also had been informed by some employees that various past industrial hygiene air monitoring was conducted only at times of non-normal working and mixing conditions. Also these testings had been done when the chemical mixing operators and supervisors have been informed and instructed in advance either indirectly or prepensely.  At those times, the operators have been told to take extra precautions and to be very attentive not to disturb any chemical mixing operations or to generate dust conditions.

Many of these chemical powders by themselves, and while in contact with other chemicals or when air-borne, as can occur with a spill, have been recognized as a potential danger by Material Safety Data Sheet (MSDS) standards. I also need to mention that I was told by a former recent employee that all manufacturing supervisors have been instructed not to speak to me and under no circumstances to forward my calls to anyone employed at the company. So, again I need to re-emphasis that since I no longer am employed there, I have no knowledge of whether any corrective actions or preventive safety measurements have been taken.

*And again, it was a no win situation, especially after repeatedly conveying my concerns about the various safety issues  to many management. And, again I had no other choice but to continue to suffer from severe allergic reactions which were activated by exposure to the hazardous chemicals at my work. Although I could have always chosen to take a discriminatory treatment actions, pertaining to the fact that my employer intentionally didn't eliminate the sources of my work related illness. But again, I wanted to act in good faith and very diplomatically without causing a panic among other workers do my job and to continue to do my best to identify and to at least minimize the potential health and safety issues and to continue bringing them up to the attention of the management. I also wanted to give  reasonable time to my employer to correct their series of  unsafe work practices before leaving no other choice but to contact a public and  have them to enforce their authority.*

**Element # 4, and evidence supporting the element:**

**(Disparate Racial Treatment in Preventing me from Processing the Work Related Injury)**

Starting the month of September 2000 my symptoms had become more extremely severe, and I had been seen by a few separate doctors on different occasions, while paying for the expenses myself.  I had been told by my physicians allergy specialist that through a series of extensive chemical skin patch reaction testing it is apparent that my symptoms had been exclusively activated by exposure to chemicals at my employer work site.

*(Before I continue I need to bring the following page to your attention).*

BEHZAD A. SAMIMI                                                                                    Page-1

*Following is just a summary of my medical doctor visits as the direct result of all the above work-related illnesses. This does not include the medical consultation over the phone with the doctors or nurses.*

- *My medical treatments started from 9/01/00.*
- *My medical treatments ended 4/1/02.*
- *Allergy shots began on 10/26/00 (total of 2- shots, one per each arm).*
- *Total of 52 different times I had to go and visit the hospital just for allergy shot injections. This had to be done in order to very gradually build up my resistance and immune system against chemical exposures at work.*
- *During my employment I had been under the care of 4 specialists (total of 10 separate-visits).*

On October 19, 2000 I decided to fill out an Incident Investigation Report in order to begin the process for workers compensation investigation. This was done only in good faith and in order to only to get reimbursement for my out-of-pocket medical expenses. I specifically told Mr. Ralph Delullo, the director of Environmental Health and Safety department, the above report and my intention of only getting reimbursed. Ralph again became very annoyed by this subject of work related/ occupational injury. He told me that he still believed that my injury was not work related and that I was just suffering from a common allergy. He told me he would wait on to the report and would get back to me later.

A few days after, he came in person to speak to me confidentially. To my great surprise he told me that he had talked with other managers, including Mr. Tom Costella (Director of Entire Plant Operation) about this and in his personal opinion he felt it was not advisable for me to file for workers compensation coverage. This time he was much more understanding, and then continued to say that being employed as a Manufacturing Supervisor of workers, I am considered middle management. And, that filing might somehow jeopardize my future potential and the possibility of obtaining a higher position and job advancement. He also added that as a Safety Officer he knows that all department management get a copy of the Safety Statistic Report and the specific nature of injuries. And, that the nature of my injury falls under reportable cases. He continued that all management and supervisors automatically receive all the names of all individuals that have filed a reportable case. He also said I could consider him as a concerned confidant and colleague who wanted my best interests. However, if I would like to precede with filing the report, that it would be entirely my decision. Shockingly, I didn't know what to respond to him at that moment . So, I told him to please hold on to the report, not to process it, and to let me think about it over and I would get back with him later.

As I was thinking about whether or not to file for worker compensation coverage, I was struggling with the meaning of what Ralph had told me both bluntly and indirectly. I became skeptical: Is my not filing finally likely to be my passport to a nondiscriminatory relationship of management toward me? Or, is filing most likely to even more exasperate their discriminatory conducts toward me, and most likely to be the final painful stamp on my exit visa? I had to think about it profoundly. If I chose to file, they would probably eventually find a safe, legal way to escort me out of the company.

(Before continuing my autographing incidents, I would like to remind you that I am filing this case with MCAD because of the racially discriminatory termination of my employment at TYCO. Among all the employees I have been the only individual in the history of this continually growing company that has been considered a laid-off employee. Since the employer has been continually growing, even in situations of possible job elimination, the employees has always been given advanced notice and an opportunity to other

job transfers. But in my case, the employer, due to racially motivated actions, had chosen a disparate discriminatory treatment approach to make an exception).

Continuing and going back to my previous train of thought, after my talk with Ralph, I easily recalled my recent extreme financial difficulties after being laid off in another firm with comparable but different circumstances. Just before my hiring by TYCO, it took me almost 1-full year to obtain another employment. Then I thought about my 2 small children, and two disabled parents, and a salary that I could barely survive on. I wanted to act in good faith and to give the employer additional equitable chances to straight their various non-compliance safety issues.

But, more than anything else I was worried about the future well being of my workers and their worker rights being taken away from them. And, that most likely the employer would eventually terminate my employment. Moreover, who would then be courageous enough or willing to stand up for the workers to protect their health, safety and other legal rights. I knew that presumably, correcting the safety issues and eliminating discrimination at the company would not come from authority figures at the top, or the Human Resources department, or some supervisors. Many have been victimized and been taught and advocated indirectly by the top management to be concerned mainly about one thing, meaning greed and the "Concept of the Bottom Line", numbers and dollars. The corporate culture has indirectly but clearly spelled out to the employees that it is all about "quota". With that mentality and process comprehension, management always encourages and rewards employees with generous bonuses to continue their discriminatory conducts to achieve that objective. Through their racially discriminatory concepts, the employer always has behaved substantially more critical and negatively toward minorities that happen to recognize their unethical corporate/individual greediness and desire to suggest constructively a more productive and safe action plans. On contrary and disparately if other non-minority personnel would desire to suggest the very identical issues, the employer would gladly welcome the ideas and would positively and repeatedly even reward the employees for the guidance.

In my case, I was not only considered an individual born and raised in Iran (which sometimes causes stereotyped thinking), but also they discriminatorily considered me as a threat to themselves. Management knew well of my job advancement potential, my advanced academic manufacturing background , and my past professional employment experiences. They also disliked that I had been having an excellent reputation among workers as an effective problem solver and a superb motivational production supervisor who effectively fostered a cooperative working environment. They considered me a threat specially as an Iranian born manufacturing supervisor who had one of the highest academic backgrounds in manufacturing than any other supervisors, as well as many of the top management. They had to somehow find a way to continue creating a hostile working environment for me so either to eliminate my position, or cause me to resign and look for employment elsewhere.

It has been known throughout the company that there were two other individuals with similar safety and ethical ideas as mine. In fact, these two individual also happened to work at the same department (hydro-gel) as mine, and they were also both from a foreign country (Greece). They were Nick Gargalidis (Production Supervisor), and Peter Kousoulis (Dept. Manufacturing Manager). They were well liked by many manufacturing workers. These two individuals also chose to jeopardize their career advancements to get up and do the right thing, and to constructively criticize unethical misconduct. These two individuals, also as a result of employer planned intentions lost their jobs, and were forced to accept a generous severance package and to sign a release waver categorizing them as voluntarily resigned individuals. In fact since there was much talk among other workers about this discriminatory employer movement toward them that the

management had decided to hire me, a member of a similar racial category minority to divert and reverse the discrimination comments that had been spreading throughout the company. Some workers even commented that it was amazing that I even looked like them.

I always attempted to disagree with the workers' above comments, and always endeavored to foster a cooperative atmosphere. My main intentions were especially to unite the management and workers closer to each other, to increase the workers moral and values toward the company, and ultimately lead to a more productive working atmosphere. Many times, without going through the details of the comments I had heard, I suggested to the management and Human Resources department about the significance and the need to conduct diversity training seminars and training throughout the company. What I wanted to convey to the management was that we needed to have a much more corporate ethical reform. Many very good and productive workers would come to my office and many almost in tears. I was penalized many times and repeatedly by means of creating a hostile working condition, false evaluation reports, job advancement limitation, reduced benefits and privileges, depriving work related illness investigation, termination, and lack of medical reimbursement related coverage.

Many times management warned me not to get involved in worker and labor relations and not to try to change the corporate mentality that has already been established (meaning pro-profitability of the corporation rather than pro-workers). Instead all management/ supervisors were forced to go through mandatory extensive training classes called "how to preserve a union free manufacturing environment".

By no means have I ever during my entire work history background at any time wanted to advocate a unionized workplace. In fact I had never have worked in a union work environment anyhow. All I wanted to do was to very diplomatically assist the employer toward a more ethical behavior.
What the bottom line is, is that the most important element, unfortunately, in some corporations is to do what is in their own best interest. I also knew some of the management were under extreme pressure and indirectly had been encouraged to continue and speed up production, no matter what it took, to achieve some of the corporation's and individuals' greedy goals. I have to admit this had been one of the most difficult decisions of my life. I made the difficult decision against my best judgement by agreeing to NOT file the Work Related Injury Report, and consequently had to continue to pay work related medial expenses out of my pocket. I came to the final conclusion that I would be of much more support to my coworkers and my family if I remained employed.

But, I kept my personal belief that at the same time I would maintain the objective and ultimate goal of worker protection, and attempt to identify, evaluate and suggest different ways of safety and ethical practices as best as I could; to reduce, and foremost eliminate potential health and safety emissions that would ultimately be translated into increased worker moral and in conclusion higher corporate productivity. This was to be accomplished in my mind while striving to be a very fair and firm supervisor first with exemplary virtues within myself. I knew this would be a very complex task since I was not a part of management (Manufacturing/ Production Supervisor).

I was optimistic and was willing to put up with some things as long as I could contribute to my coworkers as best as I could. I didn't want my corrective actions to be classified as a so called disgruntled "whistle-blower" individual without giving the employer a reasonable and fair second chance for a change. More than anything else I wanted very much to act in good faith and very diplomatically and while endeavoring to increase the worker productivity and cooperation in the approach of more ethical course of undertakings. I

knew it would have to be possibly a progressive change in individual unethical misconduct when one is dealing with an unethical corporate culture mentality. But, I was ready for that challenge.

*And again, as I am repeating myself, it was a no win situation for me to dispute with the employer and face race related retaliation and risk losing my job and the opportunity to continue supporting my coworkers. And, over and again I felt I had no other choice but to continue suffering from severe allergic reactions which were activated by exposure to the hazardous chemicals at my work. Although I could always chosen to take discriminatory actions or to contact a public-body to have them enforce their authority.*

### (Disparate Racial Retaliation of Job Elimination for Reporting Unsafe Work Practice in Writings)

On the month of September 2001, the newly designed "80-Line Machine" began start-up testing operations by going through a series of experiment production proceedings. This newly invented machine had the product line conception of an admixture of many other internal machines with the distinction of introducing a brand new product line. This was being done through non-stop advocating of mainly major transformations of expanded modernization methods, production acceleration, and enhanced modification engineering techniques. The Engineering Department, Research & Development and Technical Service were directly involved from the original concept to final assembly and final review innovation process.

Associated components with the line are consists of various combustible powders which are being operated in conversion of the product. The substance is reported as admixture of finely ground combustible chemical powders in a different particle size range. This new 80-Line machine had already at the primarily stage associated costly expenditure expenses. Although it had a moderately good potential of future accomplishment, but in reference with "Exposure Control Assessment" had many air-born chemical dust generation deficiencies. Since the entire machine theory and assembly parts were originated internally, the mechanism conformity innovation, classification and all associated pertinent industry regulations of the product output should had been very carefully authorized and certified during the final "trial/ experimentation" Product approval/ compliance intervals. But, unfortunately the employer under its management operation had main desire as to always only concentrate on speeding up the engineering design assembly to finalize its production process planning in order to acquire higher profitability margin as quickly as possible. In midway course of this engineering processing they had again once more neglected many operative dust generation safety issues. The primarily safety emission over and again had been surrounding the same negligence pattern of ignoring worker potential chemical exposure and its associated inherent hazards.

The 80's-Line consisted of open chemical powder drums, hoppers and holding tanks that had not been designed sealed tight. During the machine operation the operators had to manually vacuum from this open drums into the hoppers. But, you could easily see clouds of chemical dust leaking from the holding tanks, open drums and dust leaky hoppers. Many times due to the deficiency of original design in withstanding the pressure, all of a sudden there would be a massive physical outburst (explosion like) of the machine. As the result of this ongoing outburst all the associated seals as well as all the joint gaskets and fittings seal would burst, causing diffusion and distribution of chemical dust all over the work area. The most distressing of these incidents, in addition to being detrimental to the air quality, was that these incidents would happen while other surrounding machinery were fully operational making highly sensitive diagnostic medical products. This room did not have an exhaust ventilation system, which would cause the air-born chemical dust to float in the work site for a long period of time throughout the day.

I could not believe or understand the rational behind the employer's lack of sensitivity for continuing their unsafe work practices. Not only had they not eliminated the source of our (mostly minorities) continuous illnesses, but also they were adding much more each day to the sources of many illnesses. The location of this new 80-Line machine also happened to be chosen in the same room known as the heart of the company, where many safety deficiencies had been brought to the attention of management. Without correcting or investigating the known reports of unsafe working conditions they had decided to create an entirely new unsafe work condition. Moreover, now this new machine, when in operation, added to the chemical dust generation of adjacent machines (60's-Line, Auto-Mix, and Gel-Mix/ Chemical Rooms) that had been making the indoor air quality even substantially more worse.

Finally, after repeated intercommunications with management face-to-face and via phone calls about this safety issue including the Research & Department Dept., Facility Engineering Dept., and Safety Dept., I got the final authorization to go ahead and to again contact the Director of Maintenance (Gerry Gagne) for the exposure control assessment improvement. But, this time on December 13, 2001, I decided to also request this improvement work via email, addressing all appropriate management for their immediate corrective actions. I also included with my findings step-by-step suggestions for improvements. The next day Ralph Delullo came in person to me and informed me that he was not very pleased that I had requested for this exposure control assessment for air quality improvement in writing and in such detail. He specifically was not pleased with me that I had mentioned that the roof exhaust ventilation had not been functional for a very long time. Well, again, although the work was approved from the management, they took no actions. When I again and again re-demanded safety improvements they bluntly told me they will get to it when they can. However, a few months had passed and no corrective action had been taken.

In another circumstance in regards to the new 80's-Line machine, another safety issue originated. The previously mentioned combustible chemical powders by a new recommendation had to be made into smaller particle sizes into micron range. In order to accomplish this size range, management had decided to have workers use their hands through a manual straining process which pressed through a known micron filtration procedure and into an open drum without any respiratory face masks. This was creating clouds of chemical powder all over the atmosphere, and much worse directly into the workers lungs. Immediately as soon as I saw this, I questioned Lenny Harris, the previous shift supervisor, about the unsafe work practice. He told me these procedures had been authorized by the management, and it was not such a big deal. His shift workers had been doing that all day, and it was very important for the company to have the workers continue this powder staining process, since by the next shift they would need 2-3 more full drums of this powder. Well, indeed, it was a big safety issue to me. If I was forced to continue this process, I would take my own worker safety precautions as best as I could. I had the drum fully covered and sealed with a clear plastic and created two small openings that would cover the whole filtration on the drums for workers hands to go through them. I also had the workers fully equipped with coverall suiting, safety goggles, gloves, and a half face respiratory protection and to take all the safety precautions to minimize the dust generation. I would actually stand there and watch them doing the operation, making sure that they follow all appropriate safety precautions. But, I still was very unhappy with this primitive manual chemical straining processing. This process should have been automated and performed in a closed and well-ventilated area. I also had noticed and been told that other workers outside of my shift were allowed to continue the straining chemical powder as before (meaning unsafe work practice and without any supervision). Management bluntly would not emphasize to the workers to take all appropriate safety precautions during the operation. They would actually tell the workers that these chemical powders are positively known harmless. The only respiratory protections that were given to them were paper-like facemasks which provided very little protection. Many uninstructed workers had chosen to not use a face mask at all.

The previous page unsafe work practice was very discriminatory, since this time not only they have intentionally and discriminatorily ignored to eliminate the source of my illnesses, but also the employer approved by management were knowingly targeting exposure to dangerous chemicals mainly to certain group category of minority individuals. Some individuals voiced their refusal to work under those conditions. To the temporary minimum wage workers, management bluntly gave them a choice of either doing their work assignments or no longer be working there. To me, this was the last unethical work practice arising from series of racial discriminatory actions. I had no choice but to stand up more firm and start documenting these series of employer discrimination actions in writing.

I had become aware that the employer needed a major corporate ethical reform. Corporation corruption also sometimes goes beyond the corporation's bad accounting practices. What's much worse is that there are also corporation discriminatory unethical conducts, such as intentionally ignoring safety issues of certain racial ethnic groups and others, and jeopardizing the lives and health of innocent workers for the achievement of higher corporation profits and mainly for the boss's higher stock market return. By no means do I have an anti-business mentality and philosophy. I believe businesses are where my jobs, my wife's jobs, and my children's future jobs will be. But, I have a problem when CEO's and top managers are discriminatorily making pro-business personal profit decisions rather than making conscientious pro-worker health and safety resolutions. On January 17, 2002 I decided to request the correction of this latest unsafe work practice also in writing with all appropriate management. The next day I noticed an enormous shift of alienation and withdrawal from the management as well as other supervisors towards me. It was as if I didn't even exist. They were minimizing their interactions with me as best as they could. Many of my normal business questions were responded by just a plain yes or no answer. I knew that now the employer knew well that I had decided to start reporting all unsafe work practices in writing the requests to the management. And, that they were not happy at all about this behavioral change in my latest corrective action plan. They were worried and nervous that I now meant what I suggested. They did not want to take that chance, and had to get rid of me once and for all. This had to be done so they could continue their discriminatory actions on others and to assist the corporation CEO's greed for personal benefit. When you are dealing with unethical corporation mentality you can't have them "police themselves". There is very limited legislation that protects or encourages people that want to end or minimize discriminatory and unethical employer misconduct. There are very limited employment protections for individuals that want to act in good faith, to have their voice heard, to stand up and protect the public, consumers and workers. I knew in advance that the problem with many big corporations is that they, or their high priced attorneys, know the laws very well. They know exactly how far, and how, and when to push the law to get away with so many unethical and discriminatory misconduct and still be safe to continue their unethical behavior.

On February 7, 2002 right before I was about to go home, Mr. Jim Thomson asked me if I could come early to work the next day. On February 8, 2002 shortly after I arrived early to work, Mr. Thomson walked me to the Human Resource Department and then walked away from the Office. All of a sudden I found myself in a closed room with the Jim Scott (Director of Entire Manufacturing Operation), and Donna Heffernan (Manager of Human Resources). I knew very well what is going to happen next and management's final step. They handed me the "Job Elimination Notification". But, we all knew very well it was "Employer Retaliation" of my ongoing inquiries and especially my latest inquiries for reporting the unsafe work practices and encouraging corrective actions. Management acted by intentionally eliminating my job. Again, this job elimination was executed without any prior notice of their decision and without granting me a chance to apply for past, current or future job openings. They escorted me out of the office that day and asked me not to return.

In summary, I feel TYCO has discriminated against me and others as minorities.  They have continued to create unsafe work environments, especially if those suffering are of minority backgrounds.  I feel my position was unjustly terminated, as a result of the truths I had in good faith uncovered and the just conditions I asked for myself and my coworkers. It is not the individual incidents that are important. It is all about pattern. Pattern speaks for itself, and at my former workplace the disparate pattern was one of management intentionally & discriminatorily ignoring my concerns, and planning and executing their racially biased and motivated actions by showing repeated racial opposition toward me.

There are numerous other discrimination actions in many different discriminatory variation have occurred, but I have chosen to leave these out and only concentrate on those that directly affect health safety.  If you are interested and it would be helpful, I would be more than fortunate to submit those details to your office.

Very Respectfully,

Behzad A. Samimi

Enclosures:

- Copies of Employee Evaluation (3)
- Copy of Response to Employee Evaluation
- Copy of Employee Personal Evaluation
- Resume, Safety Related Project Highlights
- Former Employer (ATC) Recommendation Letter
- Employment accomplishments